<u>**NOT FOR PUBLICATION**</u>

**United States District Court**
**for the District of New Jersey**

| |
|---|
| ROBERT MOSES |
|                  Petitioner, |
| |
| v. |
| |
| KATHY MACFARLAND; WILLIS MORTON, Administrator, New Jersey State Prison; PETER G. VERNIERO, Attorney General of the State of New Jersey |
| |
|                  Respondents. |
| |

Civil Nos.: 97-2118 (KSH)

<u>Opinion</u>

<u>**Katharine S. Hayden, U.S.D.J.**</u>

        Robert Moses, a New Jersey state prisoner, challenges his 1993 Essex County conviction for murder (and other crimes) by petitioning for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. As indicated by the Court's primary docket number, Moses's journey through both the state and federal systems has been protracted; only recently did his petition become fully ripe for review. Now, for the following reasons, the Court will deny Moses's petition and will decline to grant a certificate of appealability (COA).

        **I.**      **Background**

        A) <u>Offense, Trial, and Conviction</u>

        In October of 1992, Robert K. "Zoom" Moses was charged alongside Marvin "Tink" Williams and Chancell Youmans with crimes connected to the August 1992 shooting death of Corey "Giz" Stevens in Newark. Moses was tried separately before a jury in December 1993.

Because the statements and trial testimony of witnesses are critical to a proper evaluation of Moses's claims, the factual portion of the Appellate Division's direct-appeal opinion is set forth in full:

At approximately 9:00p.m. on August 23, 1992, Andre Shoulers was in the area of Hawthorne Avenue. On that night he witnessed co-defendant Marvin Williams and James Hardman argue over a card game. Shoulers also saw Williams hit Hardman over the head with a baseball bat. Co-defendant Chancell Youmans was present to witness the argument, but he was not a participant. After the argument, Williams and Youmans left the scene in a blue Ford Taurus. The Taurus was owned by Williams' girlfriend.

Shortly thereafter, Shoulers, Kevin Martin, Shouler's friend, and the victim, Corey Stevens, left the area to go to Prince Street. They went to Prince Street to speak with Williams to make sure that "nothing won't [sic] happen." The defendant, Robert Moses lives on Prince Street. When Shoulers, Martin and Stevens arrived at Prince Street they observed [Moses] standing next to a white Acura Legend automobile and retrieving a black sweatshirt (hoodie) from the trunk. Thereafter, Williams and Youmans got into the Acura Legend and Shoulers told them that there was "no need for any conflict" or that "there was no need to pack guns in it" because they were all from the same area. Shoulers even suggested that they resolve the situation by fighting. However, Williams did not like that idea and indicated that "no, there are guns involved." Shoulers saw Williams with the black TEC-9 handgun that he had displayed earlier while on Hawthorne Avenue. Shoulers saw Williams threaten James Hardman with the black TEC-9 on Hawthorne Avenue earlier that night when Williams and Hardman were engaged in the argument over the card game. Not being able to reason with [Moses], Williams and Youmans, Shoulers, Martin and Stevens returned to Hawthorne Ave.

At approximately 12:30A.M. on August 24, 1992, Sterling Alexander drove to the Boys' Club on Hawthorne Ave. As Alexander approached the Boys' Club, he saw two people inside the alleyway adjacent to Williams' house. He identified one of the persons as [Moses] and indicated that [Moses] was wearing a black hoodie. Alexander said that both [Moses] and the other individual had guns and they kept peeking around the corner looking in the direction of the Boys' Club and the nearby playground. The playground is located behind the Boys' Club. At this time, the victim and a couple of other people were standing near the playground.

Alexander stopped his car by the playground so that he could talk to the victim. The two began to talk, and approximately five minutes later, Alexander heard gunshots. The victim ran to the playground and Alexander looked through his rear view mirror and saw [Moses] running from Williams' house with a gun.

[Moses] was shooting the gun towards the playground. Alexander left the area and returned approximately ten minutes later to discover that the victim had been shot.

Shoulers also testified that he saw [Moses] holding a black TEC-9 gun on that night. When he first saw [Moses], the victim was standing on the street. As the defendant began shooting the gun, the victim ran to the playground and fell. Shoulers ran over to the victim and saw blood and realized that the victim had been shot. As a result, Shoulers and some friends took the victim to the hospital by car. The victim subsequently died from a gunshot wound to the head. Shoulers testified that when [Moses] was shooting the gun, he did not see Williams or Youmans.

In a statement to the police, Shoulers never indicated that [Moses] was the person who shot the victim on August 24, 1992. However, on cross examination, he maintained that he knew all along that it was [Moses] who shot the victim. Shoulers did not tell the police that it was the defendant who shot the victim because Shoulers "'wanted to get Mr. Moses himself."

Shortly before the shooting, Demetrice Hardin was on his way to his home which is located on Tillinghast Street, just around the corner from Hawthorne Avenue. He was about four or five houses from his residence when he heard several gunshots. After hearing the shots and within a minute, he saw [Moses] and another person run out from between the houses. As [Moses] approached him, Hardin asked "Who that? Who that?" [Moses] then shot at Hardin, who ran behind a van for refuge. [Moses] and the other male then ran across the street, entered a blue Taurus and left the area.

None of the eyewitnesses to the killing of Corey Stevens immediately came forward to speak to the police. Shoulers did not speak to the police until two days later, and Hardin did not come forward until one week later. Alexander never told the police or anyone what he knew about the incident until the day he testified at trial. Daryl Jackson testified for the defense. He stated that at the time of the incident he was on the playground but he was under the influence of drugs. As a result, he did not remember the incident. However, in a statement to the police on August 24, 1992, Jackson indicated that the victim was shot by a tall, light-skinned passenger of a blue Taurus or Jetta automobile. He said there were three people in the car which drove past the playground on Hawthorne Avenue. He further testified that as the car drove past, the shots were fired. Nevertheless, Jackson did not identify [Moses] as the person who shot the victim.

(Apr. 7, 1995 Op. 2–5.)

Moses was convicted of all charged offenses. He was sentenced to a term of life imprisonment with 30 years of parole ineligibility.

B) <u>Appeal and State Post-Conviction Relief</u>

On direct appeal, Moses attacked a jury charge, alleged prosecutorial misconduct, and contested portions of his sentence. The Appellate Division affirmed in an unpublished opinion, and the New Jersey Supreme Court denied a petition for certification on June 20, 1995. *See State v. Moses*, 142 N.J. 453 (1995).

Moses then filed a petition for post-conviction relief (PCR). As developed further below, he contended that he had been deprived of "crucial information regarding the credibility of a surprise state witness," and had therefore been denied due process of law at trial. Developing the facts behind this claim took a long while; Moses's PCR application was filed in the summer of 1996, and the PCR court denied relief on November 29, 2001.

On PCR appeal, Moses added an attack on his sentence. The Appellate Division summarily affirmed in December 2003, holding that it was "satisfied that these arguments are without sufficient merit to warrant discussion in a further written opinion, and that the order of denial should be affirmed substantially for the reasons set forth by Judge Ryan in his written opinion of November 29, 2001." (Dec. 1, 2003 Op. 3–4.) The Appellate Division separately rejected the arguments "directed to the sentence" as procedurally barred. (Dec. 1, 2003 Op. 4.). Certification to the New Jersey Supreme Court was again denied. *See State v. Moses*, 180 N.J. 150 (2004).

C) <u>Federal Procedural History</u>

The federal procedural history of this case began in April 1997, when Moses filed (through counsel) a short federal habeas petition in order "to comply with the recent enactment" of the Antiterrorism and Effective Death Penalty Act of 1996 (AEPDA). (Apr. 23, 1997 Let. 1 [D.E. 1].). The petition, originally assigned to Judge Bissell, raised three bases for relief: 1)

prosecutorial misconduct, 2) errors in the jury charge, and 3) a <u>Brady</u> violation in connection with the testimony of witness Sterling Alexander. (*See* Pet. ¶¶ 12a–c [D.E. 1].)

Moses asked that his petition be held in abeyance pending the resolution of his then-ongoing state postconviction proceedings. Hence, the petition was administratively terminated without prejudice to its later reopening. (*See* July 31, 1997 Order [D.E. 6].)

In 2004, Moses moved *pro se* to reinstate his federal habeas proceedings. (*See* Motion [D.E. 7].) After some back and forth, the request was eventually granted, and the petition was transferred to this Court. (*See* Order [D.E. 10].)

Around the time Moses originally moved to reopen these proceedings, he filed a second, *pro se* 28 U.S.C. § 2254 petition, which was separately docketed under civil number 04-4441. In that *pro se* petition, Moses reiterated the "surprise witness" claim and jury-charge claims, but raised two new federal allegations: 1) he was "denied due process" due to juror misconduct, and 2) he received ineffective assistance of counsel.[1] [D.E. 1 in 04-4441.] Case 04-4441 was later consolidated with case 97-2118. (*See* June 23, 2005 Order [D.E. 5 in 04-4441].)

The state answered in 2006. [D.E. 14.] After further procedural delay relating to the retention of counsel, Moses filed a counseled reply in early 2012 [D.E. 20, characterized on the docket as "objections"], in which he "consent[ed] to dismissal of the new claims [raised in the second petition]," and agreed to have the petition ruled upon as originally filed. (Reply 4.)

## II.    Standard of Review

As Moses's petition was filed after April 1996, the AEDPA standard of review applies. *United States v. Thomas*, 221 F.3d 430, 434 (3d Cir. 2000). AEDPA limits the "the availability of federal habeas relief . . . with respect to claims previously 'adjudicated on the merits' in state-

---

[1] Moses's form petition was not accompanied by a memorandum, although it internally refers to one.

court proceedings." *Harrington v. Richter*, 131 S. Ct. 770, 780 (2011) (quoting 28 U.S.C. § 2254(d)). Habeas relief cannot be granted on those constitutional claims unless the state court's decision was "contrary to" or "involved an unreasonable application of" clearly established holdings—not dicta—of the United States Supreme Court. 28 U.S.C. § 2254(d)(1)–(2); *Williams v. Taylor*, 529 U.S. 362, 412 (2000). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts. Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 412–13. The relevant Supreme Court decisions must be those "set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003); *see also Greene v. Fisher*, 132 S. Ct. 38, 45 (2011).

As the Supreme Court has repeatedly emphasized, "this standard is difficult to meet." *Harrington*, 131 S. Ct. at 786. In particular, to succeed under the "unreasonable application of" prong of § 2254(d), a petitioner must show that "the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786–87; *accord Eley v. Erickson*, 712 F.3d 837, 847 (3d Cir.) (quoting *Harrington*), *cert. denied*, 134 S. Ct. 254 (2013); *Richardson v. Ricci*, No. 10-4954, 2013 WL 3863994, at *4 (D.N.J. July 24, 2013) (McNulty, J.), *COA denied*, C.A. No. 13-3696 (3d Cir. order entered Dec. 4, 2013).

### III. Discussion

6

A) Prosecutorial Misconduct

Moses alleges that the prosecutor crossed the line into impermissible misconduct during the following exchange, which occurred during the prosecutor's summation:

**Prosecutor**:     About a week ago the Reverend Jesse Jackson gave a speech to a group of young high school students in Atlanta. As he addressed the gathering he asked them if you are walking down a hallway and you saw in an open locker a Ku Klux Klansman in Ku Klux Klan paraphernalia, what do you do? Would you tell the authorities? Would you tell the principal? Every one of those individuals in that auditorium raised their hand and said they would.

Reverend Jackson then asked the next question. If you were walking down your high school hallway and you saw a fellow student take out a gun and shoot another student; what would you do? Would you tell the principal? Would you tell the authorities? There was a smattering of hands that went up. The vast majority of those high school students in that auditorium on that day stated that they would not go to the police [and] would not go and tell the principal.

Reverend Jackson then went on to say: Did you know that there have been more killings by gunshots to young people in inner cities, inner city black males—

**Defense Counsel**: I'm going to object to this.

What does this have to do with the evidence in this case?

**Prosecutor**:     Judge, this is an analogy. I will bring it together in one moment.

In one year there are more killings than throughout the entire history of lynchings by the Ku Klux Klan.

These individuals or high school students have a mind set. That mind set: Don't tell on people who get involved with the police. Don't be involved with authorities. Be suspicious of authority. That is the mind set of these three individuals on Hawthorne Avenue in this particular case and that is what we have to deal with.

(Pet. ¶ 12a.) Later in the summation, the prosecutor began to discuss "the leading cause of death to black males between the ages of 15 and—" before drawing an objection. The objection was sustained. (Pet. ¶ 12a.)

Moses contends in his petition that this line of summation was improper:

> The thrust of the prosecutor's statement was twofold: first, to bring in matters outside the record to explain his witnesses' failure to come forward with their stories and, second, to enflame the jury over both the high crime and death rate among black males and the unwillingness of those in the community to report those crimes to the police. In so doing, the prosecutor violated Petitioner's constitutional rights to due process and a fair trial.

(Pet. ¶ 12a.)

Moses originally raised this claim on direct appeal. The Appellate Division reviewed the remarks in question before deciding there was no error, holding both that "[d]rawing an analogy in summation is not improper," and that, under the circumstances, the conduct was not such that a new trial was warranted. With regard to the statistical commentary, the judge properly instructed the jury that it was not bound "by any comments that were made by the attorneys" and that the remarks were not to be considered as evidence. (Apr. 5, 1995 Op. 9–12.)

This decision passes muster under 28 U.S.C. § 2254(d), and the Court will defer to it. "When analyzing a claim of prosecutorial misconduct, the key question is whether a state prosecutor's comments to the jury 'so infec[ted] the trial with unfairness as to make the resulting conviction a denial of due process.'" *Rolan v. Coleman*, 680 F.3d 311, 321 (3d Cir.) (quoting *Greer v. Miller*, 483 U.S. 756, 765 (1987)), *cert. denied*, 133 S. Ct. 669 (2012); *see also Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). Here, the Appellate Division weighed the prosecutor's conduct against the effect of the curative instructions and the circumstances of the trial as a whole. *See Darden v. Wainwright*, 477 U.S. 168, 182 (1986). Neither the prosecutor's use of a statistical analogy during the summation phase of the trial, nor his attempts to contextualize the state witnesses' reluctance to come forward, clearly exceeded the boundaries established by the line of relevant Supreme Court cases.

Moses relies to the contrary on *Moore v. Morton*, 255 F.3d 95 (3d Cir. 2001), but *Moore* is easily distinguishable. Significantly, there the Third Circuit quoted the portion of the opinion of the Appellate Division that specifically found the prosecutor's comments to be improper:

> Although we are persuaded that the prosecutor's comments did not deprive defendant of a fair trial, we would be derelict if we did not express our disapproval in the strongest terms. The summation showed a disregard of the obligation of the prosecutor to play fair and see that justice is done. [citation omitted]. Our role, however, is not to supervise or punish prosecutorial misconduct. It is to examine the trial for fairness. Fortunately, the judge, unlike the prosecutor, was sensitive to the need for a fair trial and promptly and forcefully delivered curative instructions to the jury.

*Id.* at 108. In granting habeas relief, the Third Circuit pointed out that governing Supreme Court precedent "requires the reviewing court to factor the prejudicial effect of the prosecutor's improper remarks into the jury's finding of guilt and then assess its impact." *Id.* at 113. Surveying the record, summarizing the various comments made by the prosecutor, and noting that the evidence was "not strong," the Circuit distinguished the fact-pattern in *Moore* from those instances where the Supreme Court had found "highly prejudicial prosecutorial arguments curable." *Id.* at 119. Hence, in "[t]aking into account the prosecutor's highly prejudicial comments, the trial judge's curative instructions, and the strength of the evidence, [the Third Circuit] believe[d] a reasonable application of Supreme Court precedent requires finding Moore's trial was so infected with unfairness that it was constitutionally infirm." *Id.*; *see also id.* at 120 (Rendell, J., concurring) (observing that that prosecutor's remarks "were, in fact, outrageous in their direct appeal to the jury to decide the case on improper grounds and abandon the standards that our system of justice requires").

In this case, the prosecutor's comments do not warrant such condemnation, and were curable. *See Donnelly*, 416 U.S. at 647 ("[A] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through

lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations.").  The Appellate Division reasonably decided that the prosecutor's comments were not improper at all, and was not required to weigh their effect against the quantum of evidence supporting guilt or innocence.  *Fahy v. Horn*, 516 F.3d 169, 204 (3d Cir. 2008) ("[T]he comments Fahy recites were either not improper, or if they were improper, not prejudicial."); *cf. Werts v. Vaughn*, 228 F.3d 178, 205 (3d Cir. 2000) (holding that if remarks by a prosecutor are not improper, counsel cannot be ineffective for failing to object to them).

In sum, Moses's misconduct claim does not succeed on the merits.

B) Jury Instructions

Moses attacks the trial court's failure to charge the jury on accomplice liability, alleging that its failure to do so deprived him of due process.  "Indeed," he asserts, "the record is replete with evidence that [Moses] was in the car, but that Williams was the shooter"; but "under the charge given by the trial court, the jury could not consider that, as an accomplice, Petitioner could have been guilty of a lesser crime."  (Pet. ¶ 12c.)

Again, this claim was raised on direct appeal, although (as the Appellate Division pointed out) it had not been raised at trial.  The Appellate Division summarized the sequence of events at trial, emphasizing that "[t]he defendant failed to request that the judge charge the jury on accomplice liability in relation to count two, murder[,] and count three, aggravated assault" and that the judge "made clear that the accomplice liability charge was applicable only to the unlawful possession of a weapon charge."  (Apr. 5, 1995 Op. 7.)  From a review of the record, the Appellate Division concluded that the charge was not clearly warranted; the state did not try the case (which was a one-defendant case) on an accomplice theory, and the small amount of

contrary evidence was not sufficient to compel the judge to issue *sua sponte* an alternative instruction.  (Apr. 5, 1995 Op. 7–8.)

"Generally, a jury instruction that is inconsistent with state law does not merit federal habeas relief."  *Salesky v. Balicki*, No. 10–4806, 2012 WL 1059504, at *3 (D.N.J. Mar. 27, 2012) (Simandle, J.), *COA denied*, C.A. No. 12-2166 (3d Cir. order entered Jan. 11, 2013).  The alleged error must rise to the level of a federal constitutional claim.  *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991); *Johnson v. Rosemeyer*, 117 F.3d 104, 109 (3d Cir. 1997).  "An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law" in an erroneous instruction.  *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).

As a preliminary matter, this claim was raised almost entirely as a state-law claim before the Appellate Division.  Despite invoking "federal- and state-constitutional right to due process" in his brief, Moses argued primarily on the basis of *State v. Weeks*, 107 N.J. 396 (1987), and *State v. Bielkiewicz*, 267 N.J. Super. 520 (App. Div. 1993), two cases discussing the permissible dimensions of jury charges under New Jersey state law.  *See, e.g.*, *Weeks*, 107 N.J. at 405–06; *Bielkiewicz*, 267 N.J. Super. at 534–35.  Moses also briefly referenced *Keeble v. United States*, 412 U.S. 205 (1973), which discussed instructions for "lesser included offenses" in the context of federal jury instructions.  *See id.* at 208.  But by and large, his application to the Appellate Division focused on the charge's appropriateness under state law; no federal constitutional argument was advanced.  This claim is thus arguably unexhausted and, at this late stage, procedurally defaulted.  *Sweger v. Chesney*, 294 F.3d 506, 520 (3d Cir. 2002) ("A district court [] has the discretion to raise [procedural defualt] *sua sponte*."); *see also Day v. McDonough*, 547 U.S. 198, 206 (2006) ("[T]he Courts of Appeals have unanimously held that, in appropriate

circumstances, courts, on their own initiative, may raise a petitioner's procedural default, *i.e.*, a petitioner's failure properly to present an alleged constitutional error in state court . . . .").

Assuming without deciding that the claim was properly presented, it nevertheless lacks merit as a federal constitutional claim. Indeed, the deficiencies of the claim are cast in stark relief by examining the cases Moses cites in support. In *Laird v. Horn*, 414 F.3d 419 (3d Cir. 2005), for example, a faulty accomplice liability instruction relieved the prosecution of its fundamental burden of proving intent to kill beyond a reasonable doubt. *See id.* at 425–28. And in *Vujosevic v. Rafferty*, 844 F.2d 1023 (3d Cir. 1988), a pre-AEDPA case, the Circuit discussed a court's obligation to give a "requested instruction on lesser included offenses"—easily distinguishable from the present situation when no such instruction was actually requested. *Id.* at 1027. The Appellate Division decided that no such charge was appropriate under a variety of state-law theories, and Moses cannot conflate an affirmatively given, constitutionally flawed charge (as in the cases above) with the absence of a charge that was neither appropriate nor specifically requested (as is the situation here). This claim fails.

C) Withholding Impeachment Evidence

1) *Background of the Claim*

This claim, the centerpiece of Moses's habeas petition and the reason why proceedings in state court became protracted, focuses on the testimony of witness Sterling Alexander, who was one of three state witnesses who testified about the events of the night Stevens was murdered. Moses contends the circumstances behind Alexander's testimony—he was called as a last-minute witness, and neither the state nor the defense previously knew of his whereabouts—led to several crucial deficiencies in the trial. Most notably, Alexander may not have been who he said

he was, a line of inquiry that did not become apparent to the defense until after Moses's conviction.  Deciding this claim requires a detailed recapitulation of the events at trial.

The state's first trial witness was Andre Shoulers, and it was through his testimony that the prosecution provided evidence of the card game, the initial assault, and the fatal shooting.  Shoulers testified that he was talking with a group that included Stevens—with Sterling Alexander coming up the block—when Moses ran "from around the side of the building," firing a weapon.  (Vol. 1 Tr. 43:10–18, 44:6–8.)  Shoulers claimed to have seen Moses fire two or three shots at Stevens—Shoulers's best friend—before seeing Stevens fall to the ground.  (Vol. 1 Tr. 29:18–22, 47:11–25.)  He recognized the gun because Marvin Williams had been holding it earlier in the evening, although Shoulers did not see Williams at the time of the shooting.  (Vol. 1 Tr. 48:8–12.)  Shoulers drove Stevens to the hospital, but did not at the time tell the police what he knew about the shooting.  (Vol. 1 Tr. 55:23–56:9.)

On cross examination, Shoulers admitted that he gave his statement to the police many days after the incident.  (Vol. 1 Tr.  59:2–7.)  When he *did* go to the police, he went because he was aware a detective was looking for him.  (Vol. 1 Tr. 60:19–22.)  And in his initial police statement, he did not identify Moses, referring to him only as "a dude" while claiming he did not recognize the shooter.  (Vol. 1 Tr. 63:8–9.)  Shoulers also testified that he didn't tell the police about Moses because he wanted to "get [Moses]" himself, and admitted being close enough to Stevens to want to kill and lie on his behalf.  (Vol. 1 Tr. 66:23–67:25.)

After Shoulers finished testifying, the court took its lunch recess.  Outside of the jury's presence, the following colloquy took place:

**Prosecutor**:    The witness has appeared.  We were trying to locate, at the beginning of this case, Mr. Sterling Alexander.

I notified defense counsel about this potential witness many months ago. I reminded [him], a week before last, about Mr. Sterling Alexander.

He has appeared. I am about to begin to interview him. I understand he does have relevant information as to the shooting of Mr. Corey Stevens based upon the testimony and discussion I had with Mr. Shoulers.

***Judge***: So what do you want?

***Prosecutor***: Judge, we could proceed with Mr. Demetrice Hardin. I would request that we at least wait until tomorrow so I could at least have an opportunity to speak to Mr. Alexander and let defense counsel have the same opportunity before we present him, if we do decide to use him as a witness in this case.

***Judge***: Let us do one thing at a time. Let us take Hardin's testimony and deal with the other.

(Vol. 1 Tr. 75:6–25.)

Demetrice Hardin testified next. He too was friends with Stevens, and had encountered Moses "a few times." (Vol. 1 Tr. 76:14–24.) Hardin did not witness the murder, but he did see Moses with a gun and was later fired upon as Moses fled the scene. (*See, e.g.*, Vol. 1 Tr. 81:21–82:21.) Like Shoulers, he did not immediately go to the police. (Vol. 1 Tr. 65:19–23.)

On cross, Moses's attorney probed Hardin's claim that his reticence to go to police was due to being "too upset," pointing out that Hardin had *not* been "too upset" to return to the scene of the shooting. (Vol. 1 Tr. 88:16–22.) Also discussed was the fact that Hardin had given his statement to police on the same day as did Shoulers; according to Hardin, both were taken to the police station by the same detective. (Vol. 1 Tr. 93:6–24.) Unlike Shoulers, Hardin identified Moses in his statement to police, albeit by his nickname "Zoom." (*See* Vol. 1 Tr. 110:15–18.)

After Hardin finished, the jury again left the courtroom, and the judge and the attorneys discussed Sterling Alexander's upcoming testimony.

14

| | |
|---|---|
| ***Judge***: | As far as the next witness is concerned, I gather that he is someone whose name has been known, but nobody has been able to find him until that point. Is that a fair statement? |
| ***Defense Counsel***: | Yes. |
| ***Prosecutor***: | Yes. |
| ***Judge***: | We will spend a few minutes and talk to him. You can ask to talk to him. You tell me whether or not we can take his testimony today, before we lose him again. |
| ***Prosecutor***: | ***We did run a record check on Mr. Sterling Alexander. My investigator just did. Nothing came up as a prior felony, Judge.*** |

(Vol. 1 Tr. 111:12–24 (emphasis added).) After a short recess, the colloquy continued:

| | |
|---|---|
| ***Judge***: | Are there any legal matters or anything before we move on to Sterling Alexander? |
| ***Defense Counsel***: | I have one comment that I will put on the record. The Court may or may not be aware at this time that I had no knowledge Mr. Sterling was going to be available as a witness. The Prosecutor apparently made a representation that it was a surprise that he walked in. |
| | I tried to interview him with Mr. Marrucci but a witness in the case needed him. There are a lot more questions I want to ask Mr. Sterling, Judge. Now, the few minutes that I had to go over this with him, he is claiming to be an eyewitness to the shooting. He is somebody who comes in not only at the eleventh hour but at the twelfth hour. |
| | I would like a little more time to talk to this kid and find out an awful lot more about him. Now basically, we have time to do this, time to go over what he claims he saw at the time of the shooting. I don't know what his relationship with Giz [Stevens] was. I don't know how close they were. I do not know what they did afterward. I have not discussed this information until today so I need some more time, Judge. |
| ***Judge***: | The one statement you made, his name has been known for some time. Is that it? |
| ***Defense Counsel***: | He was never around. |
| ***Prosecutor***: | The name is in Mr. Shoulers' statement. It was given on August 27, 1993. |

**Defense Counsel**: That is right.

**Judge**:         Overrule the objection.  Bring in the jury and we will proceed.  You had 20 minutes or so to talk to him.

(Vol. 1 Tr. 112:3–113:12.)

Alexander proceeded to testify.  He had grown up with Stevens and knew Moses (as Zoom) "from the streets."  (Vol. 1 Tr. 114:14–17, 116:2–7.)  According to Alexander, on the night in question he was driving to "go get" Stevens; but as he approached the Boys' Club to look for him, he "saw two people in the alleyway inside Marvin Williams' house."  (Vol. 1 Tr. 117:2–18.)  The two people were Moses, who was wearing a gray hoodie, and "somebody with a black hoodie on."  (Vol. 1 Tr. 117:25, 118:10.)  Alexander testified that both individuals were holding guns and were peeking around the corner at the playground where Stevens and "a couple of other people" were standing.  (Vol. 1 Tr. 119:6–13, 120:12–16.)  Alexander drove up to Stevens and remained in the car while they talked.  After about five minutes, he "heard gunshots."  (Vol. 1 Tr. 121:10–19.)  While Stevens was running away, Alexander looked into his rear-view mirror and saw Moses charging forward, brandishing a weapon.  (Vol. 1 Tr. 121:20–122:11.)  Alexander immediately drove off and did not see anybody get shot.  (Vol. 1 Tr. 122:12–17.)  Returning to the scene later, Alexander was informed that Stevens had been hit.  (Vol. 1 Tr. 123:1–2.)

Then, the following:

**Prosecutor**:    Did you at any time prior to today come forward with any information concerning the shooting?

**Alexander**:     No.

**Prosecutor**:    Did you ever speak to any police officer?

**Alexander**:     No.

16

| | | |
|---|---|---|
| *Prosecutor*: | Or any Prosecutor? | |
| *Alexander*: | No. | |
| *Prosecutor*: | **Mr. Alexander, you have one prior felony conviction from Judge Codey. Is that true?** | |
| *Alexander*: | **Yes.** | |
| *Prosecutor*: | **You pled guilty to possession of a handgun. Is that true?** | |
| *Alexander*: | **Yes.** | |
| *Prosecutor*: | I have nothing further. | |

(Vol. 1 Tr. 123:6–19 (emphasis added).)

On cross examination, Moses's attorney questioned Alexander about his story, asking him to expand upon the version he gave on direct. (*See, e.g.*, Vol. 1 Tr. 130:3–9.) He also elicited an admission that Alexander and Shoulers were very close, as were Alexander and Hardin *and* Alexander and Stevens. (Vol. 1 Tr. 130:19–22, 131:1–4, 134:17–22.) Alexander further admitted that he knew Shoulers was planning on testifying (Vol. 1 Tr. 132:5–7) and that he had only testified because he had been subpoenaed that morning to appear (Vol. 1 Tr. 133:2–13; *see also* Vol. 1 Tr. 136:23–24 (testifying on redirect that he believed that would get "locked up" if he did not appear)). After Alexander finished, the court adjourned for the day.

The next day of testimony featured testimony from state witness Lyla Perez, a forensic pathologist, and defense witness Daryl Jackson, who testified as described in the Appellate Division's direct-appeal opinion. When the jury left for the day, the conversation returned to Sterling Alexander:

| | |
|---|---|
| *Judge*: | I'm concerned about one thing with respect to Sterling Alexander. He was asked whether he had been convicted of a crime. He said that he had. There has been no judgment of conviction set forth before me. Has he been sentenced? |

17

**Prosecutor**:          Judge, I have not reviewed it. I do not know whether or not he has a conviction. That was his statement.

**Defense Counsel**: I assume that he knows if he was convicted. I never saw anything.

**Judge**:          He said he was convicted before Judge Cohn?

**Prosecutor**:          Codey.

**Judge**:          Codey?

**Prosecutor**:          Yes.

**Judge**:          Has anybody checked that out?

**Prosecutor**:          We will check it out, Judge, this evening. Judge, we did try to check it out.

**Judge**:          Maybe it is under a different name.

**Prosecutor**:          We asked him about the name. He said he did not have any other names.

**Judge**:          I'm a little concerned because if, in fact, he pled guilty but has not yet been sentenced, that could implicate a different charge, at least another charge. It would be a pending charge.

**Prosecutor**:          Right, Judge.

**Judge**:          Dealing with any interest he might have in testifying, although he was not asked it. I'm a little concerned about that.

**Prosecutor**:          He stated he was sentenced.

**Judge**:          He did not say that. . . . I do not think he said that.

**Prosecutor**:          Explain it to me.

**Judge**:          That is very interesting. On the record he was asked whether he was convicted, and he said yes. I have no idea what he thinks is a conviction. Now you all decide what you want to do about this overnight and how much time you want for summations . . . .

(Vol. 2 Tr. 53:25–55:17.)

18

The third and final day of trial encompassed summations and the jury charge. Among other things, defense counsel emphasized the various disparities between the witnesses' versions of the evening—for example, the number of guns alleged to have been involved—while pointing out the inconsistent (and allegedly implausible) identification testimony. With regard to Sterling Alexander, defense counsel described his story as "incredible," focusing on Alexander's testimony that he saw Moses and an accomplice lurking with weapons, but did nothing to warn possible targets. (*See, e.g.*, Vol. 3 Tr. 22:9–22.) The jury retired to deliberate at 11:00A.M. and returned its verdict of guilty the following day at 11:10A.M.

After trial, Moses hired an investigator to probe Sterling Alexander's background. As recounted in the initial PCR petition and its associated materials, a licensed private detective, Richard Childs, discovered that "[t]he name Sterling Alexander is an alias for Gary Andrews," and that "Alexander" had used the Andrews name in the criminal proceeding briefly referenced at Moses's trial. (*See* Childs 1996 Decl. ¶ 4.) Moreover, police records "indicate[d] that Sterling Alexander ha[d] used the aliases Cory Alexander, Gary Andrews, Sterling Andrews, Hassan King, [and] Alexander Sterling." (Childs 1996 Decl. ¶ 5.) On Moses's behalf, Childs sought materials like "original arrest sheets, gallery photographs" and so on from the state. (Barrett Cert. 3.) Eventually, Childs provided a statement to the state court, attesting that:

1) Sterling Alexander, who died in 1997, and another individual, Hassan King, "invented the alias Gary Andrews and used it for the purposes of deceiving law enforcement authorities";

2) "Sterling Alexander appeared in Judge Codey's court using the alias Gary Andrews on three occasions": when he was arrested, when he pleaded guilty, and when he was sentenced;

3) Alexander had lied on numerous occasions about his identity.

(Childs 2001 Aff. ¶¶ 7–9.)

2) *State Court Opinions*

In a written opinion on Moses's application for postconviction relief, a judge other than the one who presided at the trial identified as "[t]he paramount question" whether "the State had a duty to disclose that the witness . . . had used an alias or fake name." (Nov. 29, 2001 Op. 6.) The court emphasized that, based on the transcript, "the defense had equal access to the information pretrial, i.e., that Sterling Alexander was identified in the statement of a third party as being present at the scene of the crime"; the defense thus had "ample opportunity to likewise investigate." (Nov. 29, 2001 Op. 6.) Because of the defense's opportunity, it could not "now cry foul." (Nov. 29, 2001 Op. 7.)

Turning to the substantive *Brady* claim, the court held that it fell short on two grounds. First, there was no record evidence suggesting that the state was aware of Alexander's alias. Moreover, there was no basis to suggest that the alias would actually be discoverable. "Thus, the first *Brady* factor—suppression—is not present." (Nov. 29, 2001 Op. 7–8.) Second, the alias evidence was not material. The court noted that, under New Jersey law, "'the fact of alias names should be kept from the jury unless relevant for some purpose.'" (Nov. 29, 2001 Op. 9 (quoting *State v. Paduani*, 307 N.J. Super 134, 147 (App. Div. 1998); *State v. Salaam*, 225 N.J. Super. 66, 72 (App. Div. 1988)).) And given the nature of Alexander's testimony, "there was no real possibility that the introduction of his use of an alias would have 'led the jury to a result it otherwise might not have reached'." (Nov. 29, 2001 Op. 9 (quoting *State v. Macon*, 57 N.J. 325, 336 (1971)).) The court concluded by deeming the proposed defense strategy of "he lied before and he's lying now" as "irrelevant, unduly prejudicial and remote in time" under N.J. R. Evid. 402 and 403; "the use of an alias on a prior occasion, for whatever reason, would not in the instant case be of significant probative value." (Nov. 29, 2001 Op. 9.)

On appeal, Moses argued that the Law Division had misinterpreted his claim: "the Court's primary focus in rendering its decision was incorrectly placed upon the aliases used by Alexander, rather than Alexander's criminal history, pattern of lying to law enforcement and history of telling falsehoods under oath that were withheld as a result of the suppression of said aliases." (App. Br. 15.) The issue was not the admissibility of the alias, but rather what learning about his use of the alias would imply. Relying on *Kyles v. Whitley*, 514 U.S. 419, 437–38 (1995), Moses stressed that the existence of a criminal record is imputed throughout law enforcement. (App. Br. 16.) Thus, "by suppressing evidence of the aliases, the State also suppressed material evidence regarding Alexander's past, which could not have been ascertained by the defense without knowing Alexander's true identity." (App. Br. 17.) Further, the evidence would have been material under *United States v. Bagley*, 473 U.S. 667, 682 (1985). (App. Br. 18.) In a short opinion, the Appellate Division denied relief "substantially for the reasons set forth by" the Law Division. (Dec. 1, 2003 Op. 4.)

3) *Substantive Law*

"In *Brady v. Maryland*, the Supreme Court held that a defendant's due process right to a fair trial is violated when the prosecution withholds evidence that is both favorable to the accused and 'material either to guilt or to punishment.'" *Carter v. Rafferty*, 826 F.2d 1299 (3d Cir. 1987) (quoting *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). The *Brady* line of cases, which includes *Giglio v. United States*, 405 U.S. 150 (1972), and *United States v. Bagley*, 473 U.S. 667 (1985), covers impeachment evidence in its ambit when, if the evidence were to have been "disclosed and used effectively, it [could] make the difference between conviction and acquittal." *Carter*, 826 F.2d at 1305.

In *Kyles v. Whitley*, 514 U.S. 419 (1995),[2] the Supreme Court stressed that materiality under *Brady* and its progeny is shown when "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435; *see also id.* at 434 (discussing a "reasonable probability" of a different result). *Kyles* also suggested that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Id.* at 437.

Finally, while *Brady* error is "trial error," "once a reviewing court applying *Bagley* has found constitutional error there is no need for further harmless-error review." *Id.* at 435. In other words, a court need not apply the separate *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993), test to determine whether a *Brady* error is harmless. *Kyles*, 514 U.S. at 435; *see also United States v. Clay*, 720 F.3d 1021, 1026 n.4 (8th Cir. 2013).

### 4) *Is AEDPA Deference Required?*

The AEDPA standard of deference contained in 28 U.S.C. § 2254(d) applies to "any claim that was adjudicated on the merits in State court proceedings." As Moses argued before the Appellate Division, the Law Division appeared to answer a different question than the one he proposed, focusing on whether the *alias itself* would be admissible rather than whether the fact of using an alias would open Alexander to impeachment.

Generally, when a claim is presented to the state courts but is not resolved, AEDPA deference does not apply. *See, e.g.*, *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001). The Law Division appeared to misunderstand the thrust of Moses's *Brady* claim, addressing it on an unnecessarily narrow ground and thus limiting the full reach of the constitutional claim. As

---

[2] Because *Kyles* was decided before Moses's conviction became "final," its holding applies to his case. *See Beard v. Banks*, 542 U.S. 406, 411 (2004).

Moses asserts, the issue is not the admission of the alias evidence *per se*, but the full knowledge of Alexander's criminal history—a history that includes allegedly impeachable instances of mendacity.

However, the Law Division did not have the last word. The Appellate Division examined the claim and, finding it without merit, summarily affirmed "substantially for the reasons set forth by" the Law Division. This adds an additional wrinkle, for a line of Supreme Court cases emphasizes that "Section 2254(d) applies even where there has been a summary denial." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1402 (2011) (citing *Harrington*, 131 S. Ct. at 784). "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Harrington*, 131 S. Ct. at 784. The *Harrington* decision, in turn, pointed to *Ylst v. Nunnemaker*, 501 U.S. 797 (1991), a case where the Supreme Court ruled that: "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Id.* at 803; *accord Wenger v. Frank*, 266 F.3d 218, 228 (3d Cir. 2001) (citing *Ylst*).

Many of the decisions applying the *Harrington* line of cases (and its predecessors) grapple with the distinction between state-court decisions on the merits and state-court decisions on procedural grounds. For example, in a recent Sixth Circuit case, a summary appellate affirmance "for lack of merit in the grounds presented" was determined to be a *procedural* ruling based on the particular circumstances of the case. *See McClellan v. Rapelje*, 703 F.3d 344, 348–51 (6th Cir.), *cert. denied*, 134 S. Ct. 399 (2013). The procedural/substantive divide is starker, and perhaps easier to discern, than two different substantive bases for denying a claim, one of which arguably misses the actual claim raised by the petitioner.

Nevertheless, "[w]hether a claim has been adjudicated on the merits is a case-specific inquiry," *Winston v. Pearson*, 683 F.3d 489, 496 (4th Cir. 2012), *cert. denied*, 133 S. Ct. 1458 (2013); and, in this context, the Court concludes that the Appellate Division ruled on the alternative, correct basis presented by Moses on appeal. *See Caswell v. Ryan*, 953 F.2d 853, 860 (3d Cir. 1992) (discussing the "strong evidence" rebuttal of the *Ylst* test). Despite its use of boilerplate, there is no reason to think that the Appellate Division willfully overlooked Moses's clarification and reframing of the claim in his appellate materials. Although its opinion purported to affirm for substantially the same reasons that the Law Division originally rejected the claim, as *Harrington* and *Cullen* make clear, it is contrary to the spirit of AEDPA to read into the Appellate Division's decision a tacit admission that it did not consider Moses's alternative reading of the claim. Rather, Moses squarely presented the alternative reading and the Appellate Division found it unconvincing.

Thus, the Court concludes that, under *Harrington* and *Cullen*, deference should be given to the Appellate Division's summary rejection of Moses's appeal. Accordingly, the Court will employ the AEDPA standard of review in evaluating the claim.[3]

5) *The Merits*

"To demonstrate a *Brady* violation and obtain a new trial based on the suppression of evidence favorable to the accused, the defendant must therefore show that (1) the government

---

[3] The Court acknowledges that this approach exists in some tension with the general practice of examining the "last reasoned decision" of a state court in evaluating a petitioner's claims. *See, e.g.*, *Simmons v. Beard*, 590 F.3d 223, 231–32 (3d Cir. 2009). The Third Circuit has continued to employ the "last reasoned decision" approach post-*Harrington*. *See, e.g.*, *Moore v. Diguglielmo*, 489 F. App'x 618, 625 (3d Cir. 2012) (nonprecedential per curiam); *Williams v. Beard*, 637 F.3d 195, 226–27 (3d Cir. 2011). However, the Circuit has not, to this Court's knowledge, examined the "last reasoned decision" approach in this specific context: where a petitioner alleges that a lower court misconstrued a claim, but receives a largely unreasoned summary affirmance or dismissal from the appellate court.

suppressed evidence (2) favorable to the defense and (3) material to guilt or punishment."

*Morelli v. United States*, 285 F. Supp. 2d 454, 459 (D.N.J. 2003) (Bassler, J.) (citing *Moore v. Illinois*, 408 U.S. 786, 794–95 (1972)).  Under 28 U.S.C. § 2254(d), deference is owed even if the state-court decision does not "reveal which of the elements in a multipart claim it found insufficient, for § 2254(d) applies when a 'claim,' not a component of one, has been adjudicated."  *Richter*, 131 S. Ct. at 784.

Having thoroughly examined the state-court record, the Court is satisfied that governing Supreme Court precedent does not compel a conclusion that the State unlawfully suppressed evidence.  "*Brady* does not require early disclosure," and while it may be "preferable for *Brady* materials to be disclosed well in advance of trial," such timing is not required in all cases. *United States v. Wecht*, 484 F.3d 194, 230 (3d Cir. 2007).  *Kyles* calls for a state prosecutor to "obtain and turn over to the defense favorable evidence known to a state police officer who investigated the case."  *United States v. Reyeros*, 537 F.3d 270, 281 (3d Cir. 2008).  The prosecution did in fact disclose the existence of Alexander's criminal history at trial, and nothing in the record shows that either the prosecutor or the police were aware of Alexander's use of an alias, or otherwise knew of Alexander's criminal history at an earlier time; in fact, Alexander himself told either the prosecutor or the investigators that he had not used an alias.

And *even if* the first two prongs of the *Brady* test were met—that the evidence of Alexander's history was actually suppressed and would have been favorable to Moses— fairminded jurists could decide that the impeachment evidence was not "material" to the outcome of the trial.  *Richter*, 131 S. Ct. at 786; *see also Cobb v. Thaler*, 682 F.3d 364, 381 (5th Cir. 2012) ("[T]he materiality standard is a general rule, meaning a wide range of reasonable applications exist."); *Lambert v. Beard*, 633 F.3d 126, 133–34 (3d Cir. 2011) (discussing

reasonableness of materiality decision). Habeas proceedings do not find the petitioner and the state on equal footing; rather, Moses must meet his burden of showing materiality. *See, e.g.*, *George v. Longley*, 463 F. App'x 136, 141 (3d Cir. 2012) (nonprecedential per curiam) (citing *Skaftouros v. United States*, 667 F.3d 144, 158 (2d Cir. 2011)). He has not met this burden.

A case from the Seventh Circuit presents facts that are strikingly similar to the ones at bar. In *Crivens v. Roth*, 172 F.3d 991 (7th Cir. 1999), which was decided under pre-AEDPA law, the "impeachment evidence" was the "criminal history, specifically the arrest records and rap sheets, of the state's witnesses"; the defendant argued that, had he known about a certain witness's history, he would have used it to impeach the witness. *Id.* at 996. The Seventh Circuit determined that the evidence was material because it "form[ed] the heart of the state's case against Crivens." *Id.* at 998. The trial judge had specifically credited the witness's testimony, in tandem with that of a person who witnessed the aftermath of the crime but not its core, in coming to his verdict. *Id.*

Here, the Court concludes that Alexander's testimony did not play a "pivotal" role in Moses's conviction that would render credibility-impeaching evidence material beyond debate. While Alexander bolstered Shoulers's testimony, he was not the sole eyewitness and did not, as did Shoulers, witness the entirety of the shooting. Nor did he, like Hardin, testify that Moses both had a gun and fired it. Shoulers, Hardin, and Alexander were all successfully impeached on other grounds. And counsel *was* able to undermine the testimony itself, by pointing to its inherent implausibility.

Nor, for that matter, was the scope of the impeachment evidence overwhelming. Alexander's criminal history, at least as uncovered and connected to the alias, is not particularly

broad. Its effect on Alexander's credibility, in light of the above, would be at best uncertain. Significantly, the jury was aware of at least one of his prior criminal convictions.

In sum, because the state court's decision is neither contrary to nor an unreasonable application of clearly established federal law, the Court concludes that Moses's *Brady* claim fails under 28 U.S.C. § 2254(d).

6) *"Confrontation Clause" Version of the Claim*

In Moses's original habeas petition, he appeared to raise the aforementioned argument as a straight *Brady* claim. But in his 2012 reply, Moses re-invokes an alternative, confrontation-clause-based approach to discussing the claim that he had used during the state postconviction proceedings, and asks that the claim be reviewed *de novo*. (*See* Reply 13.)

It should be noted that the State did not have a chance to respond to this alternative argument. The Court did not grant permission to so amend the original petition (Moses did not request leave to do so).

In any event, the claim would be without merit even if properly presented and reviewed *de novo*. "The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination. . . . Generally speaking, the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 19–20 (1985) (per curiam) (internal quotation marks & citations omitted). "Normally the right to confront one's accusers is satisfied if defense counsel receives wide latitude at trial to question witnesses." *Pennsylvania v. Ritchie*, 480 U.S. 39, 53 (1987). The right to compel pretrial disclosure does not inhere in the confrontation clause. *Id.* Moses's attempt to conflate cases in which "improper restrictions [were imposed] on the types of questions that defense

counsel may ask during cross-examination," *id.* at 52, with what occurred in the present scenario is unpersuasive. His attorney was not prevented from asking any question he wished of the witness.

**IV.    Certificate of Appealability**

The Court must now decide whether a COA is warranted. As the Supreme Court explained in *Miller-El v. Cockrell*, 537 U.S. 322 (2003):

> Consistent with our prior precedent and the text of the habeas corpus statute, we reiterate that a prisoner seeking a COA need only demonstrate "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.

*Id.* at 327.

Having examined the factual record of this case at great length, the Court concludes that Moses has not made a substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253(c)(2). The Court has enumerated the reasons why Moses's claims do not entitle him to habeas corpus relief; the Court is not convinced that other federal courts would disagree with or debate this outcome. Accordingly, a COA will not be granted.

**V.    Conclusion**

The Court denies Moses's habeas corpus petition and denies a COA. An appropriate order will follow.

January 27, 2014                          /s/ Katharine S. Hayden
                                          Katharine S. Hayden, U.S.D.J.